FILED
2012 Apr-05  PM 03:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
2012 APR -5 P 1: 58
U.... COURT
N.D. OF ALABAMA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* APRIL BROWN ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No: 2:10-cv-0135-KOB |
| ) | |
| AMEDISYS, INC., ) | **FILED UNDER SEAL** |
| AMEDISYS HOME HEALTH, INC. ) | |
| OF ALABAMA, ) | |
| ) | |
| Defendants. ) | |

## FIRST AMENDED *QUI TAM* COMPLAINT

Relator April Nicole Brown ("Brown"), on behalf of herself and the United

States of America, alleges and claims against Defendants Amedisys, Inc. and

Amedisys Home Health, Inc. of Alabama (collectively, "Amedisys"), as follows:

## JURISDICTION AND VENUE

1. This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33

(the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28

U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2. Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a),

because Defendants qualify to do business in the State of Alabama, transact

substantial business in the State of Alabama, transact substantial business in this judicial District, and can be found here. Furthermore, Defendants committed within this judicial District acts proscribed by 31 U.S.C. § 3729, to-wit: Defendants submitted to the United States false claims for payment for home health services that were never performed, were provided to ineligible patients, or were unnecessary and improper, and made or used false records material to such false claims.

## PARTIES

3.    Amedisys is a Baton Rouge, Louisiana-based corporation engaged in the business of providing home health and hospice services. Amedisys has service locations in 45 states and Puerto Rico.    Amedisys  operates its home health business with the intent of fraudulently maximizing its billing to and reimbursement from the United States by engaging in a pattern and practice of: (1) "upcoding" home health prospective payment data by fraudulently manipulating and altering patient "OASIS" information in order to inflate Medicare prospective payments; (2) billing the United States for unnecessary therapy services and for services it never performed; (3) billing the United States for service to ineligible, non-homebound patients; and (4) making or using false records containing patient assessment data – material to  such false claims – recorded by non-qualified

2

personnel or containing information fabricated by personnel who had no knowledge of the patients' actual conditions.

4.     Relator Brown is a licensed registered nurse (RN) of nine years experience. She was employed as a home health nurse by Amedisys in April, 2009 in its Monroeville, Alabama location. Ms. Brown immediately became aware that Amedisys' business practices are designed to fraudulently maximize billing to the United States by falsely representing the type and severity of patients' medical conditions. Ms. Brown communicated her concerns to her superiors at Amedisys including Regional Manager Pam Arnold. She was met with hostility and was terminated by Amedisys shortly thereafter.     Ms. Brown has witnessed numerous instances in which Amedisys has fraudulently inflated its Medicare billing to the United States and in which Amedisys billed Medicare for patients whom it knew were not homebound and did not qualify for the Medicare home health benefit. Through her experience, Relator has become convinced that Amedisys' fraudulent schemes represent wide-spread systematic practices endemic to Amedisys. Amedisys' conduct is offensive to Relator as a dedicated healthcare professional. Accordingly, in October, 2009, Ms. Brown reported Amedisys' fraud to the United States Department of Health and Human Services Office of the Inspector General. She filed this action as original-source relator under the *qui tam* provisions of the

3

False Claims Act. Relator has served upon the United States a written disclosure of the material evidence upon which her claims are based.

## MEDICARE HOME HEALTH COVERAGE

5.    Through the Medicare program administered by Center for Medicare and Medicaid Services (CMS), the United States provides health insurance to eligible citizens. *See* 42 U.S.C. §§ 1395, *et. seq*. As part of its coverage, Medicare pays for some "home health services" for qualified patients. In order to qualify for home health care reimbursement under Medicare, a patient must: (1) be homebound – *i.e.*, the patient is generally confined to her home and can leave only by dent of considerable effort; (2) need part-time skilled nursing services or speech therapy, physical therapy, or continuing occupational therapy as determined by a physician; and (3) be under a plan of care established and periodically reviewed by a physician and administered by a qualified home health agency (HHA). *See* 42 U.S.C. 1395(f). When a patient so qualifies, Medicare will pay for: (1) part-time skilled nursing care; (2) physical, occupational, or speech therapy; (3) medical social services (counseling); (4) part-time home health aide services; and (5) medical equipment and supplies. *Id.*

6.    Medicare pays for home health care by way of a Prospective Payment System (PPS). *See* 42 C.F.R. § 484. The PPS is based on a "national prospective 60-day episode payment," a rate based on the average cost of care over a 60-day

4

episode for the patient's diagnostic group.  Upon a physician's referral, an HHA is required to make an initial assessment visit and perform a comprehensive assessment encompassing the patient's clinical, functional, and service characteristics.    Accordingly, a registered nurse must evaluate the patient's eligibility for Medicare home health care, including homebound status, and must determine the patient's care needs using the Outcome and Assessment Set (OASIS) instrument.  The OASIS diagnostic items describe the patient's observable medical condition (clinical), physical capabilities (functional), and expected therapeutic needs (service).   Based upon the OASIS information – and in turn upon the expected cost of caring for the patient – the patient's "case mix assignment" is determined and the patient is assigned to one of eighty Home Health Resource Groups (HHRGs).  The patient's HHRG assignment and other OASIS information are represented by a Health Insurance Prospective Payment System (HIPPS) code that is used by Medicare to determine the rate of payment to the HHA for a given patient.

    7.      Once the HAA has submitted the patient's OASIS information, partial payment is made based on a presumptive 60-day episode.  In order to continue receiving covered care for another 60-day episode, the patient must be re-certified by a physician within the final five days of the initial episode as requiring and qualifying for home health care, and a new comprehensive assessment must be

performed. The initial base rate may be subject to upward adjustment, such as where there is a "significant change in condition resulting in a new case-mix assignment," or downward adjustment, such as where the number of predicted therapy visits substantially exceeds the number actually performed. Throughout the patient's episode, the HHA is required to maintain clinical notes documenting the patient's condition and the health services performed.

  8. From 2002 to 2006, spending by the United States on home health care rose a precipitous 44%, amounting to nearly $12.9 billion in 2006. According to a report by the Medicare Payment Advisory Commission, HHAs as an industry currently enjoy an average profit margin of nearly 16%. In light of the explosive growth in profits to private companies and cost to Medicare, abuse of the home health system has been identified by CMS as a major concern. In March, 2009, the Government Accountability Office published a report entitled "Improvements Needed to Address Improper Payments in Home Health." The GAO reported findings that the startling rise in home health spending was caused in part by fraud on the part of HHAs, including: upcoding or overstating the severity of a patient's condition; billing for medically unnecessary therapy visits and other treatment; and billing for services not rendered.

9.    Amedisys has engaged in each of the types of fraud identified above as part of its scheme to fraudulently inflate its Medicare billing and defraud the United States.

### DEFENDANTS' FRAUDULENT SCHEMES

10.    Amedisys operates its business with the goal of fraudulently inflating its profits by submitting false patient assessment data, including false information regarding homebound status, by billing the United States for health services that are unauthorized and unnecessary.

### A.    Upcoding: Fraudulently Inflating Payments by Falsifying and Manipulating Patient OASIS Assessments

11.    Through a system of falsifying and manipulating Medicare-required patient OASIS information, Amedisys systematically and fraudulently boosts its Medicare prospective payments.

12.    Medicare's home health PPS is intended to cover the projected cost of patient care. To that end, Medicare requires that an HHA registered nurse make an initial visit to each patient and perform a comprehensive assessment using the OASIS instrument. Medicare's prospective payment for that patient is then tied to the type and intensity – and therefore cost – of care that will be required. For example, a patient that is completely bed-bound manifestly requires more care – at greater expense – than a patient that is ambulatory. Similarly, some conditions, such as CVA (stroke) may require extensive, costly, physical and occupational

7

therapy, whereas others, such as minor wound care, may require only limited skilled nursing care and instruction. The admitting HHA nurse is responsible for developing a physician-approved plan of care based on the patient's clinical diagnosis and observable characteristics. Based upon the OASIS codes reported by the HHA, the patient is placed in one of 80 HHRGs and associated with one of 640 HIPPS codes that are designed to provide the most accurate payment for each patient. With the goal of fraudulently placing patients in higher-value groups and boosting Medicare payments, Amedisys systematically manipulates the PPS through two primary means:

### a.   Using "Point of Care" Software to Exaggerate Severity

13.   Amedisys utilizes a proprietary "Point of Care" software system (POC) that is designed to overstate the severity of patients' clinical and functional characteristics and falsely boost reimbursements. Amedisys requires its RNs, in performing their initial comprehensive patient assessments, to input their OASIS data via laptop computer through the POC system. Through aggressive suggestions, prompts, pop-ups, and error messages, the POC software not only suggests that the RN record the most severe level of illness and debility – it renders it virtually impossible to do otherwise. A nurse attempting to record a less-acute patient condition finds it extremely difficult to complete his or her paperwork – a requirement for retaining employment – due to repeated error messages and

8

unwanted information automatically supplied by the software.  For nurses already intensely overworked and facing hours of paperwork each day, the only practical option is to capitulate and allow the software to record the most severe conditions, often grossly inaccurate.    When Relator discussed this situation with Ruby Norwood, now Clinical Manager at Amedisys' Monroeville location, Norwood said, "sometimes you just have to lie to get through it."  As a result of the fraudulently-designed POC software, the severity of patient conditions – and therefore the need for and cost of treatment – is systematically exaggerated.

14.    For example, during her employment with Amedisys, Relator Brown frequently performed assessments on patients diagnosed with congestive heart failure (CHF). Using Amedisys' POC software, Ms. Brown recorded the diagnosis and the patients' clinical and functional characteristics.  When Relator input the basic information, the POC software instantly supplied standardized nursing notes documenting clinical conditions corresponding with the most severe form of CHF – many of which were fictional and not exhibited by the actual patient.   POC software even supplied information about fictitious phone conversations between Ms. Brown and the patient's referring physician. In order to faithfully record the true OASIS information, Relator was forced to laboriously erase the software's suggestions and attempt to input the actual data – fighting pop-ups and error messages.    This occurred nearly every time Relator admitted a patient to

9

Amedisys' care. Nurses were told that these standardized notes were intended to validate – on paper, though not in fact – the medical necessity of skilled nursing visits and the homebound status of patients. Amedisys' POC software thereby conceals Amedisys' fraud as well as perpetrating it.

### b. Fraudulent Alteration of Assessment Data by Billing Personnel

15.     Once an RN has submitted his or her OASIS information through the POC system, Amedisys deploys its second primary strategy for inflating its prospective payments: professional billing experts known as Quality Care Coordinators (QCCs) are assigned by Amedisys to review OASIS files and pressure RNs to fraudulently alter OASIS information. With the goal of placing the patient in a more lucrative group, QCCs push RNs to approve submission of OASIS data that does not reflect the patient's actual condition. As a result, the United States pays for services that are not part of the patient's legitimate plan of care and may in fact be contraindicated by the patient's true physician-diagnosed condition.

16.     Every Amedisys OASIS is reviewed by a QCC. QCCs never see patients and have no access to medical charts. In fact, they work remotely from across the country; Relator Brown has received calls from QCCs in Louisiana and Virginia. QCCs are paid per-assessment to ensure that every patient is billed at

10

the highest possible level, regardless of the patient's actual condition and care
needs.

    17.    Under the PPS, certain HHRGs and HIPPS codes are reimbursed at a
much higher level than others – due to the expense associated with caring for
patients with those characteristics. The OASIS instrument is designed to place
patients in categories corresponding to their actual need for home care. Thus, a
patient's "primary diagnosis" is the primary condition for which the patient
requires care at home. Accordingly, the patient's plan of care will be primarily
designed to stabilize and improve that condition.

    18.    Naturally, patients often exhibit other, secondary, characteristics or
medical conditions that may or may not need to be addressed in the plan of care.
Using the OASIS instrument, the assessing nurse must record these characteristics,
which are in turn accounted for by the PPS. The corresponding HIPPS code and
prospective payment will be calculated to reimburse the HHA for providing that
care.

    19.    Amedisys, however, uses its QCCs to manipulate the system by
fraudulently altering OASIS information to falsely emphasize conditions that
generate greater reimbursement but do not truly require care. Thus, Amedisys
fraudulently places the patients in more lucrative HHRGs that do not accurately
reflect the type of care or therapy the patient requires. In so doing, Amedisys

falsely represents to the United States that it is performing certain care that is prescribed and medically necessary, when in fact it is not.

20.   For example, Relator and Amedisys' other nurses are consistently instructed and pressured by QCCs to falsely report the OASIS assessment data for diabetic patients. Medicare pays a very high prospective rate for patients who are referred to home care for sudden onset of diabetes or complications of a diabetic condition; such patients require outpatient diabetic instruction as well as therapeutic treatment.   Accordingly, Amedisys' nurses are instructed to fraudulently list diabetes as a patient's "primary diagnosis" even when that condition is entirely unrelated to the actual reason the patient has been referred to home care. Such a patient may have lived with diabetes for years and require no instruction or therapy. Diabetic instruction or related therapy therefore forms no legitimate part of the patient's home health care plan.   Amedisys falsely bills the United States and accepts payment for services that are not eligible for reimbursement.

21.   For example, in 2009, Relator personally performed the recertification of a patient, R.S., with a diagnosis of open wound and a physician order for wound care. The patient was diabetic but was well-educated as to her disease process and her condition was well-managed.   The patient required no further instruction, therapy, or care related to her diabetic condition. Nonetheless, Relator received a

12

call from Amedisys QCC Sharon Clough, who demanded that the patient's OASIS data be altered to reflect diabetes as the primary diagnosis – which would result in a much higher prospective payment. Relator explained that the patient's diabetes was not related to her wound condition – the condition requiring home care. Although the patient was entirely appropriate for home care – for wound care, not diabetic care – the QCC threatened to discharge the patient unless Relator agreed to list diabetes as the patient's primary diagnoses, generating a fraudulently higher reimbursement to Amedisys. Ms. Brown refused. Approximately one week later, Relator found on her desk an OASIS "correction authorization sheet," listing diabetes as R.S.'s primary diagnosis. When Relator appealed to Clinical Manager Sharon Dykes (Dykes), Dykes told Ms. Brown was she must sign the sheet. Relator was terminated before the crisis resolved.

22.   In another instance occurring in or around June, 2009, Ms. Brown was sent to recertify a patient D.V. As more specifically described below, the patient was not homebound and had no trouble with the activities of daily living. Accordingly, Ms. Brown faithfully rated his functionality impairment as "0." After she submitted the paperwork, an Amedisys QCC called her and said "D.V. can't be a '0,' you are going to have to change it." The QCC insisted that Relator fabricate data that would directly result in a higher bill to the United States, which

would effectively pay for care that D.V. did not need and that Amedisys was not providing.

23.     In fact, Amedisys reinforces these fraudulent practices by instructing RNs at the outset to falsely record patient information.   Payments for therapy services are extremely lucrative for HHAs.   Of course, not every patient is appropriate for therapy – often therapy will be contra-indicated by the patient's condition.   Yet, Relator Brown was instructed by Dykes that she must always assess a patient to require therapy – even if the patient had no such requirement. Dykes told Ms. Brown that RNs were under a directive from Amedisys management that therapy must be the rule rather than the exception and that any patient care plan not including therapy required an explanation and justification.

24.     On another occasion, Relator admitted a patient M.B. for physical therapy only.   She was remonstrated by Dykes for not adding skilled nursing visits to the patient's plan of care.   Relator explained that the patient's condition did not warrant skilled nursing care.   Relator did not change the care plan.   Sometime later Relator became aware that M.B.'s plan of care had been changed to include skilled nursing visits throughout the 60-day certification period.   Yet, no skilled nursing visits were actually performed after the initial assessment.   Amedisys thus billed the United States for services that were unnecessary and not actually provided.

**B.     Billing Medicare for Unnecessary Therapy Services**

14

25.     Amedisys consistently bills the United States for therapy services that are unnecessary or not performed by Amedisys at all.

26.     Under Medicare regulations, it is the responsibility of the RN performing a patient's initial assessment to evaluate the patient's care needs and develop a physician-approved plan of care.   At Amedisys, however, Clinical Manager Sharon Dykes – having never seen the patients – frequently drafted and always signed plans of care in violation of Medicare regulations for patients other nurses had assessed and admitted. Relator frequently found that these and other patients were receiving therapy services that were unnecessary and at times harmful to the patients.

27.     For example, Relator admitted and assessed a patient R.J. who had been referred to Amedisys by Dr. RoseMarie Morwessell for wound care only. The patient's wound was the direct result of a constrictive dressing applied by a physical therapist, requiring immediate surgical repair.    The patient was ambulatory with a walker was observed to perform all activities of daily living safely and unassisted – the only skilled service R.J. required was wound care. Sometime after admission, however, Relator learned that R.J. was receiving physical therapy visits, even though therapy had never been ordered by his physician and was contra-indicated by his condition.  When Relator questioned Dykes, Dykes told Relator that she had "just decided" the patient should receive

15

therapy. In R.J.'s case, Amedisys' fraudulent scheme resulted in his receiving the
same type of "treatment" that had caused his wound in the first place – physical
therapy – a vicious cycle that must ultimately do more harm to the patient than
good.

28.    As a result of Amedisys' practices of including inappropriate therapy
in patient care plans, its therapists frequently do not perform the therapy or
otherwise care for the patients.  One of Relators' patients who was admitted under
a diagnoses of neuropathy – a condition generally treated by pain medication, not
therapy – told Relator that she was receiving unwanted, unnecessary visits from an
Amedisys physical therapist who did nothing but watch soap operas on the
patient's television.  On another occasion, Relator observed a discoloration of a
patient's lower extremities that had not been assessed on admission.    In
questioning the patient, L.B., Relator learned that the Amedisys physical therapist
assessed the condition but decided it "looked more like a suntan than anything"
and made no report to the patient's primary physician or the RN case manager.

29.    Medicare requires that HHA physical therapists record OASIS
assessments for patients requiring only physical therapy.  The physical therapist
employed by Amedisys at its Monroeville location, Hans Higgenbothom, flatly
refused to perform Medicare required OASIS assessments.  As a result, Relator
was frequently asked by Dykes to falsify these records – to record patient

16

assessment information even though she had never seen the patient and had no way of knowing the patient's condition. When Ms. Brown refused, the records were fabricated by Dykes or Norwood. As a result of this improper record-keeping, patients were not properly discharged at the time their therapy needs – and their need for home care – were exhausted. Instead, Amedisys billed Medicare or Medicaid for a full 60-day episode as though therapy had continued, when it had not.

30.    Relator reported this situation to Amedisys Regional Manager Pam Arnold in October, 2009. Arnold replied: "When you only have one physical therapist, you end up bending the rules." Arnold told Relator that it was "ok" to falsify the patient OASIS information for discharge purposes because it was "just to get the billing done."

### C.    False Claims for Non-Qualifying, Non-Homebound Patients

31.    Amedisys routinely bills the United States for home health care provided to patients who are not homebound and thus do not qualify for the home health benefit.

32.    At the time of the initial and comprehensive assessments for every certification period, Medicare regulations require Amedisys to "determine eligibility for the Medicare home health benefit, including homebound status." 42 C.F.R. § 485.55. Accordingly, as part of their OASIS paperwork, Amedisys RNs

17

are required to evaluate whether a patient requires a "considerable and taxing effort to leave home"; whether the patient's "non-medical absences [are] infrequent/short duration"; and if the patient "requires medical assistance to safely leave home."

33.    In fact, however, Amedisys instructs its nurses to falsely certify homebound status and to conceal the fraud by instructing mobile, non-homebound patients that they should refrain from travel while on the home health benefit. For example, in or around May, 2009, Relator Brown assessed a patient who routinely left his home in his own car and was not homebound. When Ms. Brown called Amedisys to report that the patient was not homebound, Dykes instructed her to "just tell him he can't drive while he's with us."

34.    As a result of these practices, Amedisys falsely bills the United States for patients whom it knows do not qualify for the home health benefit. For example:

(a)    Patient R.J. was on Amedisys' service for physical therapy and wound care. R.J. requested early morning visits so he "would not have to stay home waiting on the nurse and therapist." Ms. Brown was present on several occasions when R.J. traveled to the local Amedisys office to pick up wound care supplies. R.J. told Ms. Brown that, during his home health episode, he won a jackpot at a local casino.

18

(b)     Patient M.F. was on Amedisys' service for hypertension, diabetes, and physical therapy, but was not homebound.  M.F.'s husband was a disc jockey and M.F. frequently accompanied him to his shows.

(c)     Patient J.W. was on Amedisys' service for COPD exacerbation.  J.W. was frequently absent when Amedisys' nurses came to perform skilled nursing visits. J.W. told nurses "I'm not sitting here all day waiting on you to get here."

(d)     Patient E.H. was on Amedisys' service with a diagnosis of diabetes. At one point, E.H. was not seen by Amedisys staff for over a month because he was consistently absent from home.  One Amedisys nurse did see E.H. pulling out of his driveway as she arrived.   Nevertheless, Amedisys continued to bill the United States for services to E.H.

(e)     Patient D.V. was on Amedisys' service with a diagnosis of diabetes. Amedisys staff were told that they could not visit D.V. before 11:30 because he took the bus daily to the community services center.  D.V. also frequently visited the Amedisys offices, where he told nurses that he was afraid of getting stuck in the elevator and always took the stairs.

(f)     Patient P.F. was on Amedisys' service for wound care.  P.F. was frequently absent when Amedisys' nurses visited and told Ms. Brown she was out grocery shopping and running errands in her car.  P.F.'s husband, C.F., was also a home health patient and P.F. drove him to his doctor's appointments.

19

(g)     Patient A.B. was on Amedisys' service for wound care following a
surgical procedure.  She was the primary caregiver for her husband and instructed
Amedisys' staff to "call before you come," so they could be sure she would be at
home.

(h)     Patient M.S. was on Amedisys service for physical therapy.  Because
M.S. lived several miles away from Amedisys' offices and was frequently away
from home, Dykes told Amedisys' nurses to call M.S. before they left to perform a
visit.

### D.     Submitting False Records Compiled by Unauthorized Personnel

35.     Amedisys has submitted to the United States false OASIS assessment
data compiled by unqualified personnel.  Medicare regulations require that OASIS
assessments be performed by a registered nurse or licensed therapist.  Relator,
however, directly observed Amedisys' practice of allowing licensed practicing
nurses (LPNs) to compile OASIS information and submit it to the United States.
As a result, Amedisys submits false certifications to the United States about the
conditions of its patients.

36.     Relator was directly informed by an Amedisys LPN that Dykes
instructed the LPN to compile and input OASIS information for patient transfers –
including information for patients the LPN had never even seen.  Relator
confronted Dykes about this violation of Medicare regulations, but Dykes laughed

20

and assured Relator that the practice was harmless.  In October, 2009, Relator

discussed the fraud with Arnold.  Arnold told her that allowing the LPN to submit

the information would not be a problem for Amedisys, as long as the LPN used the

RN's name and identification number.    Accordingly, LPNs were instructed not

only to compile and input OASIS information, but to fraudulently conceal their

violations by falsely identifying themselves as Amedisys RNs.

37.    Through  its  systematic  fraudulent  practices  described  herein,

Amedisys has cheated taxpayers, endangered patients, and artificially inflated the

costs of healthcare to everyone, exacerbating the problems that currently plague

the United States healthcare system.  Accordingly, to deter such fraud in the future,

Amedisys must be required to pay treble damages and penalties for its actions.

### COUNT ONE
### FALSE CLAIMS UNDER 31 U.S.C. § 3729[1]

38.    Relator adopts and incorporates the previous paragraphs as though

fully set forth herein.

39.    By and through the fraudulent schemes described herein, Amedisys

knowingly – by actual knowledge or in deliberate ignorance or with reckless

disregard of the truth or falsity of the information –  presented or caused to be

---

[1]  On May 20, 2009, the President of the United States signed the Fraud Enforcement and
Recovery Act of 2009, amending the False Claims Act as set forth in 31 U.S.C. §§ 3729-3733.
Amedisys' fraudulent actions described herein implicate both the prior and amended statutory
provisions and subject it to treble damages and penalties as set forth in the respective versions of
the False Claims Act.

21

presented false or fraudulent claims to the United States for payment or approval and knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

(a) false "OASIS" patient care assessments designed to inflate Medicare prospective payments and false, upcoded claims based on such assessments;

(b) false claims for therapy services that were unnecessary, never performed, or both;

(c) false claims for home health care provided to patients whom Amedisys knew were not homebound and false records designed to create the false appearance of homebound status;

(d) false records containing patient OASIS information recorded by unqualified or unauthorized personnel.

40. The United States paid the false claims described herein and summarized in paragraph 39(a)-(d).

41. By and through the actions described *supra*, Amedisys knowingly made, used, or caused to be made or used, false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid.

42.    Amedisys' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Amedisys by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States and herself and against Amedisys in an amount equal to treble the damages sustained by reason of Amedisys' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, further, or different relief to which Relator may be entitled.

## COUNT TWO
## REVERSE FALSE CLAIMS UNDER 31 U.S.C. § 3729

43.    Relator incorporates all previous paragraphs as though fully set forth herein.

44.    By and through the acts described herein, Amedisys knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States or to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States and knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States, to wit:

23

(a)     Defendants knew that they had received millions of dollars in home health PPS payments for patients who did not qualify for the Medicare home health benefit, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

(b)     Defendants knew that they had received millions of dollars in home health PPS payments that were fraudulently inflated by false patient OASIS assessment information, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

45.    Amedisys' fraudulent actions described herein have resulted in damage to the United States equal to the amount of money withheld by Amedisys in derogation of its obligations to refund the United States.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States and herself and against Amedisys in an amount equal to treble the damages sustained by reason of Amedisys' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Relator may be entitled.

24

## COUNT THREE
## CONSPIRACY UNDER 31 U.S.C. § 3729

46.     Relator incorporates all previous paragraphs as though fully set forth herein.

47.     Amedisys, in concert with its principals, agents, employees, and other institutions did agree to submit the false claims described herein to the United States, and the United States in fact paid those false claims.  Likewise, Amedisys in concert with its principals, agents, employees, and other institutions did agree to reduce its obligations to the United States through the pattern and practice of reverse false claims described *supra*.

48.     Amedisys and its principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims to the United States through Medicare and Medicaid and through a pattern and practice of fraudulently withholding money from the United States through reverse false claims.

49.     Amedisys' fraudulent actions, together with the fraudulent actions of its principals, agents and employees, have resulted in damage to the United States equal to the amount paid by the United States to Amedisys and the amounts of money wrongfully withheld by Amedisys from the United States as a result of Amedisys' false claims and reverse false claims.

25

WHEREFORE, Relator demands judgment in her favor on behalf of the United States and herself and against Amedisys in an amount equal to treble the damages sustained by reason of Amedisys' conduct and the conduct of its principals, agents, employees, and other institutions, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest, and such other, different, or further relief to which Relator may be entitled.

## COUNT FOUR
## SUPPRESSION, FRAUD, AND DECEIT

50.     Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

51.     Amedisys misrepresented or suppressed the material facts that: (1) that the purported cost of its patient care was exaggerated through OASIS manipulation; (2) that it had failed to perform certain services for which it was paid; (3)  that it performed services that were unauthorized and unnecessary or provided to ineligible patients; and (4) that its records were compiled by unauthorized, unqualified employees and personnel.

52.     Amedisys was legally obligated to communicate these material facts to the United States.

53.     Such misrepresentations were made willfully to deceive or recklessly without knowledge.

26

54.     The United States acted on Amedisys' material misrepresentations described herein to its detriment.

55.     Amedisys' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid by the United States to Amedisys are a result of Amedisys' fraudulent claims.

WHEREFORE, Relator demands judgment in her favor on behalf of the United States and herself and against Amedisys pursuant to 31 U.S.C. § 3732 and Ala. Code §§ 6-5-101, 6-5-102, and 6-5-103 in an amount sufficient to compensate the United States for Amedisys' fraud, suppression, and deceit, together with punitive damages in an amount calculated to deter Amedisys from engaging in such conduct in the future, along with attorneys' fees, costs, interest, and any other, further, or different relief to which Relator may be entitled.

Date:  April 5, 2012.

_____
HENRY I FROHSIN
JAMES F. BARGER JR.
J. ELLIOTT WALTHALL

**Attorneys for Relator
April Brown**

**OF COUNSEL:**
FROHSIN & BARGER, LLC
3430 Independence Drive, Suite 40
Birmingham, Alabama 35209-8326
Tel:  205.933.4006
Fax:  205.933.4008

## CERTIFICATE OF SERVICE

On this the 5th day of April, 2012, Relator hereby certifies a true and correct copy of the foregoing First Amended Complaint was filed under seal with the Clerk of Court. A copy of same is being placed in the U. S. mail, postage prepaid, to the following counsel of record:

Joyce White Vance, U. S. Attorney
Attn: Lloyd C. Peeples, III, AUSA
Lane Woodke, AUSA
U. S. Attorney's Office
1801 4th Avenue North
Birmingham, AL 35203

Joyce R. Branda
Sara McLean
Lisa Katz Samuels
Bradley M. Brinkman
U. S. Department of Justice, Civil Div.
P. O. Box 261, Ben Franklin Station
Washington, DC 20044

OF COUNSEL